Good morning, Your Honors. My name is Michael Piston, and I am representing the petitioner Nora Sakhawati in this matter. Ms. Sakhawati is a citizen and national of Bangladesh who was granted asylum and withholding of removal by an immigration judge in 2006 on the grounds that she had been kidnapped, raped, and forcibly married to a wealthy and politically well-connected man in Bangladesh. The DHS appealed that decision, then subsequently moved the BIA to remand the case to the immigration judge to consider the contents of the DHS's file in the name of Muhabban Nessa, a known alias of Ms. Sakhawati's. The Board granted that motion, and in a subsequent hearing, the IJ concluded, based primarily on conflicts between Ms. Sakhawati's testimony and the contents of the Nessa file, that Ms. Sakhawati was not credible, and so denied her applications. The issue before this Court is whether the Board of Immigration Appeals abused its discretion in granting the Department of Homeland Security's motion to remand. The record shows that the Board did abuse its discretion because its finding that the evidence submitted by the DHS in support of its motion was not available to it at the time of Ms. Sakhawati's first hearing was factually incorrect. This supposedly new evidence was, in fact, in DHS's possession at the time of her hearing, and any reasonably diligent DHS attorney would have discovered that evidence since it was filed in the name of Muhabban Nessa, and Ms. Sakhawati told the government twice prior to her hearing and once during her hearing that she previously identified herself by the name of Muhabban Nessa. She told the DHS this on November 1, 2005, when it detained her when she tried to enter the United States from Canada, and at that time she told them that she had been previously admitted to the U.S. using the name of Muhabban Nessa. Then, on April 3, 2006, she submitted to the immigration judge an application for asylum in which it was indicated that she had been previously known by several aliases, including Muhabban Nessa. Finally, she testified to being admitted under the name of Muhabban Nessa during the hearing itself. BIA regulations in HCFR 1003.2 C.1 provide that a motion to reopen proceedings shall not be granted unless it appears to the board that evidence sought to be offered as material and was not available and could not have been discovered or presented at the former hearing. As this court held in Huang v. Ashcroft, the standard is conjunctive. The new evidence must be material and not available and not discoverable at the previous hearing. The courts have repeatedly held that so long as the evidence could have been discovered through diligent research at the time of the individual hearing, it will not be considered unavailable afterwards for the purposes of a motion to reopen. A couple of cases in which it's also holding are Fongo v. Gonzalez from the 8th Circuit and Krogelak v. INS from the 7th Circuit. Here, not only didn't the DHS prove that the contents of the Nessa file weren't available to it at the first hearing, it didn't even claim it. The sole evidence which the DHS submitted in support of its motion was the contents of the Nessa file itself, plus a statement from a DHS officer who had not been involved in the Sakowatties' hearing, but simply became interested in her case later on when he met her at another trial and recognized her as someone he had previously known under the name of Muhabba Nessa. He then obtained the Sakowatties' file and that DHS's own records, compared them, and came to the conclusion that Muhabba Nessa and North Sakowattie were the same person, and that there was evidence in the Nessa file which was inconsistent with Ms. Sakowattie's application for asylum. It was on this basis alone that the DHS premised its motion to remand. I've got a question for you. This is Judge Gilman. Why has your client not waived this argument you've raised? Because she didn't directly appeal the BIA's decision in 2008 to grant the motion to reopen. In other words, you let it go back, the boards remand back to the IJ, who then made a decision that, hey, Sakowattie and Nessa are the same and therefore denied, you know, canceled, denied asylum, but you didn't appeal in 2008 when the BIA granted the motion to remand. Granting the motion to remand is not a final order, Your Honor. We only have the, this court only has jurisdiction over final orders of removal. How could we appeal? You don't think there was any right you had at that point to appeal? Not looking at 8 U.S.C. 1252, I don't see it. I see that we have the right to appeal final removals. This is a classic example of an interlocutory order. Okay. Now, it's interesting that the very same attorney who represented the DHS before the, in the individual hearing, was the same attorney who filed the motion to remand, yet even in her motion, which was not sworn, she didn't even claim that this evidence wasn't available. And she made no explanation whatsoever why she couldn't have done the same thing that the DHS did. She made no explanation whatsoever from the DHS's own records once she learned that Mubunna was an alias of the respondent, and looked at it, seen what was contained in it, and introduced it into court. In fact, for all we know, the DHS attorney did have a copy of the Mubunna, did review the Mubunna file, but just decided not to introduce it. She offers, they make no explanation whatsoever of why they didn't introduce this, why they didn't find this file before the hearing, and why they didn't introduce it into evidence. And sort of another question, do you deny the substantive merit of what the determination was that your client, that Nessa and Sakowati are in fact one and the same? Nobody's been more emphatic that Mubunna said, nor Sakowati, the same person, than Ms. Sakowati herself. She stated that to the, she volunteered that to the service on November 1st, 2005, and said it again on her asylum application, and testified to it again on the first individual court case. Doesn't that mean that your client's eventually going to lose then, because in fact she claimed she was in Bangladesh, when in fact she was in Canada? You see, your honor, that's what my client does contest. She used Mubunna, but there actually is another Mubunna. She actually presented evidence of this at the second hearing. There is a Mubunna in Alberta, Canada, and that's the person whom those landed immigrant documents applied to. This is what she testified to in the second case, that her relative, this guy by the name of Ola, was married to Mubunna, and actually used her documents to try to get a legal status for Nora Sakowati in the United States. Nora Sakowati came to the United States fleeing, having been kidnapped and abused by this fellow in Bangladesh, fleeing literally for her life, and she and her cousin, this Mr. Ola, felt that it was a life or death situation, so quite frankly they engaged in immigration fraud and submitted the documents pertaining to Mr. Ola's actual wife, Mubunna, and presented Nora Sakowati as if she was Mubunna. This was fraud, there is no doubt about it, but Mubunna, the Mubunna to whom these documents pertain is a real individual who Nora Sakowati pretended to be for the purpose of seeking immigration benefits in the United States. I gather the DHS could bring a new proceeding against your client for fraud, couldn't it? I mean, I gather your objection is the technical basis that the BIA should not have granted the motion to reopen when in fact the evidence was already there. Isn't that the essence of your argument? Absolutely. But they could start a new removal proceeding. Be perfectly frank with you. Be perfectly frank. Oh, I'm sorry, don't want to interrupt. Go ahead. They could start a new removal proceeding, right? I believe it would be barred by race judicata. The rules of race judicata, as you know, is that the government must not only present whatever claims it has against a person in the same proceeding, it must bring whatever claims they could have brought against the person in the same proceeding. So they'll have exactly the same problem in the second proceeding. They knew they could have submitted the contents of the Nessa file in the first case. So the fact that they didn't means that any subsequent proceeding would be barred by race judicata. Well, aren't there provisions for discovering something after, even if they could have done it before? No, there isn't. No, there isn't, Your Honor. The government has chosen to write the regulations in such a way that you can only get the case reopened if the evidence wasn't available at the same time. This is how they wrote the regulations, and these regulations are mostly enforced against respondents. I mean, I would be thrilled if this court were to rule today that anybody can bring up any new evidence any time in the proceedings. I mean, we as people representing respondents in this case who frequently discover new evidence later on afterwards would just go wild if that was the rule. But this is a rule which is routinely enforced against respondents, and that's why the board has this rule, because they know perfectly well if they didn't have this rule, we'd be doing most of the reopening of the government. Examples of how this court has enforced this rule against respondents can be found in, for example, the case of Hiazati, H-Y-Z-O-T-I versus Holder, 517 Federal Appendix 354, in which the court held that because somebody from Albania tried to reopen his case on the grounds that there was new evidence of his persecution in Albania, and the new evidence were newspaper articles that were written before his first hearing. And this court upheld the Board of Immigration Appeals in saying, well, you could have found those newspaper articles before your hearing. The fact that you found these newspaper articles after the hearing doesn't make this new evidence. It's exactly the same case we've got here, except I would suggest it's a lot easier for DHS to find something in their own files than it would be for somebody to research the entire Internet and find something. And yet this court held that because some article was written before the hearing, therefore it wasn't new evidence when the person tried to submit it in support of a motion to reopen. Thank you, counsel. Thank you. Does that mean my 10 minutes are up? Yes. Okay, thank you very much, Your Honor. This is Nancy Friedman for the Attorney General. Are you ready for me to proceed? We are. Okay, thank you very much for accommodating this phone interview. Most appreciated. Are you still snowed in? Got plowed at 10 p.m. last night. Okay. Thank you. Very good. Thank you for accommodating me. To begin with, Your Honors, the petitioner here is a master of fraud. She admits fraud sometimes, sometimes changes her story. It's extremely difficult to follow exactly what she claims happened to her throughout the record. We don't know where she's from or who she really is. And the reason we do not know is because she has been engaged in this fraud with two identities for so many years. Counsel. Now, I'd like to address what seems to be the essence of the petitioner's... Michael Piston. Should I proceed, Your Honor? Please proceed. Sorry, Ms. Friedman. Yes, apparently we lost opposing counsel, but as long as we have this interval, I don't think the issue is whether she's a master of fraud or anything like that. The question is whether you met the requirements for having a rehearing. Let me address why that is the case, then. As the petitioner pointed out, and as the petitioner pointed out, evidence must be material and not available and could not have been discovered or presented at the former hearing according to the regulation. Now, petitioner's argument that it could have been discovered and it really wasn't new or previously unavailable is wrong, and I'll explain why. The fact that someone uses an alias does not indicate the existence of a second A-file, and there is no way that that would trigger an investigation into the existence of an A-file. In fact, entering or being admitted to the United States does not result in the creation of an A-file. In other words, if a woman named Nessa had a passport as a visitor or some other type of visa, there is no A-file created, so it could not have been discovered. Hold on for a minute. This is Judge Stranch. The question before us is not what happens in the general case, I think, but what happens here for yours, and your briefing does not dispute that Ms. Sakowati testified that she had used the Mahooban Nessa name and that she put it on the documents that were filed with you. I think the problem for me is whose responsibility is it to take the moment to look for the file? When another immigration agent did that, that file was discovered. So I don't see an explanation in your briefing, nor do I understand why this could not have been discovered or presented at the former hearing in accordance with your CFR requirements. Well, the reason it could not have been discovered is because the admission that someone used an alias would not trigger any investigation, because once her identity is established, which it appeared to have been at the original hearing, there is no reason to look for the second A file. And moreover, it is her own lies in the 589 that also prevented the discovery of the second A file. So she is, in other words, analogous to murdering your parents and then asking for mercy because you're an orphan. What lie prevented you from looking? I'm referring to the two different asylum applications. They're in the record at Exhibits 2 and Exhibits 5. I apologize, I don't have the page numbers. Yeah, but what about them precluded you from looking for a file under the other name? Okay, I'm getting to that, Your Honor. The very first block on the 589 tells you, you know, tells the applicant to list all the A numbers. She only listed the one under Sakhawati and she failed to mention any NESA A number, which she clearly had. But it wasn't her number, according to her, it was her cousin-in-law's number. I'm sorry, I'm not clear on the cousin-in-law. Okay, I'm sorry, who... The real NESA. The real one, right? That's her cousin's wife? Yes, Your Honor. Okay, so... I don't know that a second person even exists because other than her claiming she talked to some woman on the phone, there is absolutely no evidence that there's another woman living in Canada. The only thing in the record is that she says she talked to someone on the phone. Okay, but you're saying that it's, you're saying that it's a lie. The reason she didn't list it, according to her, is because it wasn't her, it wasn't her application. But she was, in fact, applying for immigration benefits using that other name and another A number. Part C of question 2 asks the applicant if they've ever applied for or received lawful status in any other country, and she only revealed the asylum application in Canada. She never revealed that she had applied for lawful permanent resident status under the NESA identity, which she should have done. If she had revealed it, then perhaps there was a trigger for looking for another A file. There wasn't. I mean, the petitioner is making a lot of factual assumptions. But, no, you're making factual assumptions, but let me ask you this. Okay, it's your, it's the department's choice not to look for petitions under an alias. The applicant tells you, I've used these four aliases, and it's your choice to say, well, it's unlikely that there's an A number under that alias because it probably wasn't created, as opposed to an inability to look. Is that not correct? No, it's not correct, Your Honor. There are background checks done that don't reveal a separate A file, and petitioner is making assumptions that are just incorrect, and it was her repeated lies and omissions on the application she is filing that, you know, prevented any other investigations from being done until there was a triggering event later on by the revelation dug up by the investigator after her original asylum hearing had been completed. But the question counselor is, was it available, and when that triggering event occurred, your other agent immediately found the file. Isn't that correct? I believe after some investigation he found it, yes. But that was in, after she had been granted the asylum and after she appeared at her husband's or uncle's or cousin's trial, we don't know who they are to each other. She says a lot of different things at the hearing and in her applications. So there's no way to know the truth about whatever relationship they had. And I understand that that is problematic to the agency. I think the difficulty here is that there's just one standard, and we have to enforce a singular standard, and with regularity, as pointed out by your opposing counsel, our cases will say this was published about someone seeking immigration who was denied it. And we would say, no, you can't reopen because the things that you want to tell us about were available if only you had searched for them in your first hearing. If that is the requirement that we place upon immigrants, it seems to me that that's the requirement we have to place upon the agency as well. How can you get around an equal hand in enforcing 1003.2c1? Well, the reason is because the regulation itself says could not have been discovered, and it was her own fraudulent conduct that prevented that. And as I was going through before, there were a list of lies and omissions that just prevented any discovery that she should have revealed herself. The agency is not all powerful with unlimited resources to... But counsel, nor are immigrants people trying to come from foreign countries who have even fled their own country. I'm not convinced by the argument that the government who maintains files on these people and to whom is told, I have used another alias, doesn't have an ability to search its own files in a way that's perhaps easier than someone who has fled another country and now is expected to provide to the court information about why they fled. But there was no reason to search for another file at her original hearing when she established her identity, so they thought. I guess my question is, who bears the burden of that choice? And it seems to me that the person wanting to place in the evidence does, because that's what we've required of immigrants. And so you now, as the agency, must stand in the same position. And if you choose not to look, then you bear the outcome of that. But Your Honor, it's really not a matter of choosing not to look. There has to be some trigger to say, look, it seems like there's something fraudulent going on here and this person isn't who they say they are. Many times aliens come in using a false passport with a name other than their own, and that doesn't trigger an investigation into the existence of another A-file. You could, right? I want to understand this. Can you pull up A-files based on names? I don't know the exact process, so I don't want to say. I mean, many people have names that are the same or similar, so I can't definitively give you an answer to that. But your agent did. Is that not correct? Well, at the point that he was looking into it, there was a whole lot more information available than there was at her original hearing. And that's the problem. We're looking at it kind of in hindsight, but, you know, if I had a lot more time, which I don't, I could list specifically all the lies and her failure to reveal the pertinent information on the applications for relief she's submitting. And just to go back to another point that was brought up during Petitioner's argument, he says that she could not be placed in new removal proceedings, I think was the question, and he said, no, of course not, because of res judicata. There are, you know, means available to the agency to address the fraud that she admits at this point. Well, isn't that an argument that you should not be allowed to reopen, but you should explore the other means that are available to you? Well, I think, though, the issue is whether evidence that the government could not have been discovered previously can be used when it discovers the fraud. Okay, so it seems to me that you keep using the phrase could not have discovered, but that's not, you could have discovered it. You just have a reason why you didn't. Well, I don't know if we're disagreeing on the semantics of it, but like I say, the reality is that there was no way that the trial attorney at DHS could have discovered what later was discovered. But why do you keep saying that? I mean, either you can find it under someone's name or you can't. But you have to have a reason to do that investigation, and the information that she was providing, which were not true, you know, gave them no reason to look for that. What was the information that wasn't true? Okay, let's see. As I was saying a moment ago, she filed two different I-589 asylum applications, and she didn't list the A numbers, although she knew she had them. Okay, would they have yielded? One of them wasn't the one you're talking about, right? I'm sorry, what do you mean, one I'm talking about? Okay, maybe I don't understand the facts. There was an application that was filed at a particular time that indicates that she was in Canada and not in Bangladesh, right? Right. I mean, what I'm talking about was before the matter was remanded. Okay, so even if she had listed those two applications, you wouldn't have found the one that you're relying on, right? I don't know, because she didn't list the NESA A number, which she clearly knew she had. Well, why do you say she clearly knew she had? According to her, it wasn't hers. But she also admits all kinds of fraud, and so, you know, it's hard to believe anything that she says. Well, but that was what you were litigating the first time around. Okay, did you know about the two applications at the time of the hearing? Yes, this was prior to the remand. Okay, so what does that have to do with this? Well, I'm going back in time to try to explain why it could not have been discovered. Okay, the only fact that would support that it couldn't be discovered is if you cannot bring them up based on people's names. That's the only fact that would establish that it could not have been discovered. As opposed to, well, it was reasonable for us not to look. Those are two different things. Can you, I mean, do you see that? Not exactly, Your Honor. I'm just, I'm focused on all the facts she did not reveal, which if she had done so truthfully, they would have raised red flags. She did not reveal that she had applied for loss of permanent status under the... Okay, so can you just, wait, wait, counsel, can you tell us a fact that postdated the hearing? In other words, a lie on the application that you did not know before the hearing? Because if I understand you correctly, you knew about the two applications before the hearing. Yes, we knew about the applications, but we only could say what was, you know, could look at what was actually on the application. We couldn't look into something that she had omitted, such as that she had applied for a green card using a different identity. That's the issue that's in dispute, right? That was litigated on remand. No, she admits that. Oh, okay. She admitted it. When did that take place? She answered, you know, question five on the asylum application, this is exhibit four in the record, exhibit four, question five, part M as in Mary, asks if the applicant has been refused permanent resident visa in any other country. She answered no, although by that time her 485 application for status had already been denied. So, you know, she kept perpetrating these untruths. Was that not known at the time of the hearing? No, this was later. Okay. Okay, your time's up, let me see, do you have any other questions? Any questions? Okay, thank you very much. Thank you. Okay, you're on, Michael Piston for the respondent, for the petitioner. Your Honor, you asked the government if you could pull up a name, a DHS file based solely upon a name. Absolutely you can, and the reason we know that is because that's exactly what Mr. Eckert, the DHS attorney's officer, did. If you look at his investigation, you'll see that there was nothing that he, there was nothing that, the only way he pulled up this Muhabban Nessa name was by putting the name Muhabban Nessa into the file, into the DHS files. And furthermore, Officer Eckert knew exactly the same information which a DHS counsel knew at the time of her hearing. All Officer Eckert knew, which caused him to launch his investigation, was that he had known this woman under the name of Muhabban Nessa, and now she was identifying herself as Noor Sakwati. Those are the total facts which caused the Officer Eckert to start his investigation, and on that basis, he very easily brought up the Muhabban Nessa file, and he brought up, and so that demonstrates that you do not need an A number to pull the file. What about, what's your answer to her, counsel's argument though, that there was no reason that the DHS would have, that just listing a name of an alias would reasonably trigger them wanting to match the name of the alias? Your Honor, as a matter of fact, their own regulations require them to search all aliases. If you take a look at page 23 of our, pages 23 and 24 of our opening brief, HCFR 1003.47G requires that the DHS do certain investigations, they're called security checks, of anybody applying for immigration benefits, and those security checks include mandatory biographical checks, checks using the applicant's name, date of birth, and aliases, Your Honor. So they're not only, could they look under aliases, they were required to look under aliases. For all we know, they did look under the alias. As a matter of fact, because the DHS officer did inform the judge that the security clearances were, security checks were done, the presumption of administrative regularity requires us to assume that they did and that they did find the NESA file, and they simply didn't decide, they didn't introduce it, decide not to introduce it for its own reasons. That's on page 23 and 24 of our brief, and as I said before, the regulation is HCFR 1003.47G. And those, these records, I mean, are we talking about the same database? Yes, Your Honor, absolutely. And what's very significant here, Your Honor, is that to be perfectly frank, with all due respect to opposing counsel, what we've heard is opposing counsel testify in this matter. There is nothing, there is no evidence whatsoever in the record to back up all the assertions that she's made regarding that they could not have found this file, or even that it's not their policy to look under aliases. There is nothing in the record to support this. My question to this court, the question the court should be asking itself is why, who did not tear a good, who is the attorney representing the DHS at the individual hearing and who is the attorney who filed the motion to remand, why didn't she say that we couldn't have looked up, couldn't have found this file? Why didn't she say that we didn't find this file? If you look at what the government's motion, they didn't even claim that they didn't have this information available to them. All they said was that Mr. Eckert found this information. Well, so what? The fact that Mr. Eckert found the information doesn't mean that the government couldn't have found the information, and it doesn't even mean that the government didn't find the information. It simply means Mr. Eckert found it. That proves nothing. And then what about this thing about the green card? Your Honor, I'm looking at the form I-589 and I cannot find, I would, if Ms. Friedman would be so kind to point me again to the section of the I-589 where it asks if she's applied for permanent residency, I've been looking at my copy of the I-589 and I can't find it. Okay. Which line is that? The only question that I can see on the form I-589 asks if she's ever applied for asylum before. Well, she didn't apply for asylum before. I don't see any questions on the form I-589 whether or not she applied for permanent residency. Well, do you concede that there were some untruths or omissions on the application or not? The only untruth on the application was that she did not list all of her exits, all of her exits from, all of her admissions to the United States. It's also true that she did not list Mubin Nessa's A number on the file. But first of all, number one, as the court pointed out, her position was she wasn't Mubin Nessa anyway, that she was just, she just at one point posed as her. And second of all, number two, Your Honor, these applications which were filed upon her behalf, which by the way she testified were entirely prepared by somebody else, she didn't read them, she just signed them, these were all years ago. It's very, if she did not actually keep a copy of her records, nobody, let me tell you something, Your Honor, nobody goes around memorizing their A numbers. Okay? So the fact that she wouldn't even necessarily even know what an A number was. So the fact that she did not list the A number of an application which was filed in somebody else's name and whom she subsequently posed as, doesn't mean that she's lying about it. Most likely it means that she simply forgot. Okay. Your time is up. Thank you both. Thank you, Your Honor. I'm sure that my colleagues agree that the matter of presentation did not detract from it at all. So thank you both very much. Thank you, Your Honor. Thank you very much too, Your Honors.